UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

VICKI GOULET,

    Plaintiff,

v.                                                    Civil No.  06-11817-BC

JO ANNE B. BARNHART,
COMMISSIONER OF                       DISTRICT JUDGE THOMAS L. LUDINGTON
SOCIAL SECURITY,                         MAGISTRATE JUDGE CHARLES E. BINDER

    Defendant.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.   RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled, as her impairments do not prevent her from performing her past relevant work.  Accordingly, IT IS RECOMMENDED that PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE DENIED, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED, and that the FINDINGS OF THE COMMISSIONER BE AFFIRMED.

**II.   REPORT**

    **A.   Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case has been referred to this Magistrate Judge for the purpose of reviewing the

Commissioner's decision denying Plaintiff's claim for disability insurance benefits. This matter is currently before the Court on cross motions for summary judgment (Dkt. 9, 13).

Plaintiff was 46 years of age at the time of the most recent administrative hearing and has completed high school. (Tr. at 488.) Plaintiff's relevant work history included work as a spot welder, an assembler, an inspector and a general office clerk.[1] (Tr. at 77.)

Plaintiff filed the instant claim on November 1, 2001, alleging that she became unable to work on February 16, 2001. (Tr. at 52.) The claim was denied initially and upon reconsideration. (Tr. at 18-29, 5-7.) In denying Plaintiff's claim, the Defendant Commissioner considered degenerative disc disease of the lumbar spine status post fusion at L5-S1 (1998), refusion (5/99) and removal of bone growth stimulator (5/00), chronic diarrhea of unknown etiology, migraine headaches, seronegative rheumatoid arthritis (diagnosed since July 2003), status post hysterectomy (1987), and status post fracture of left fifth metatarsal (12/01) with complete healing as possible bases of disability. (*Id.*)

On December 10, 2003, Plaintiff appeared with counsel, Patricia Anderson-Green, before Administrative Law Judge Douglas N. Jones (ALJ), who considered the case *de novo*. In a decision dated January 22, 2004, the ALJ found that Plaintiff was not disabled. (Tr. at 28-29.) Plaintiff requested a review of this decision on February 10, 2004. (Tr. at 11.)

The ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[2] (AC-1, Tr. at 8), the Appeals Council, on February 13, 2006, denied

---

[1]Plaintiff worked as an office clerk and inspector on and off after back surgery, in 1998, because her physician indicated she should not bend and should avoid lifting. (Tr. at 498.)

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision,

Plaintiff's request for review. (Tr. at 5.) On April 17, 2006, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B. Standard of Review

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam). The Commissioner is charged with finding the facts relevant to an application for disability benefits. A federal court "may not try the case de novo, . . . ." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984).

If supported by substantial evidence, the Commissioner's decision is conclusive, regardless of whether the court would resolve disputed issues of fact differently, *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir.1990), and even if substantial evidence would also have supported a finding other than that made by the ALJ. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). The scope of the court's review is limited to an examination of the record only. *Brainard,* 889 F.2d at 681. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 681 (citing *Consolidated Edison Co. v. NLFB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216, 83 L. Ed. 2d 126 (1938)). The substantial evidence standard "'presupposes that there is a zone of choice within which the decisionmakers can go either way,

---

which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

3

without interference from the courts.'" *Mullen*, 800 F.2d at 545 (quoting *Baker v. Heckler*, 730 F.2d 1147, 1149 (8th Cir. 1984)) (affirming the ALJ's decision to deny benefits because, despite ambiguity in the record, substantial evidence supported the ALJ's conclusion).

The administrative law judge, upon whom the Commissioner and the reviewing court rely for fact finding, need not respond in his or her decision to every item raised, but need only write to support his or her decision. *Newton v. Sec'y of Health & Human Servs.*, No. 91-6474, 1992 WL 162557 (6th Cir. July 13, 1992). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("a written evaluation of every piece of testimony and submitted evidence is not required"); *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987) (ALJ need only articulate his rationale sufficiently to allow meaningful review). Significantly, under this standard, a reviewing court is not to resolve conflicts in the evidence and may not decide questions of credibility. *Garner,* 745 F.2d at 387-88.

**C. Governing Law**

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S.

137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen*, 800 F.2d at 537.

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). "[B]enefits are available only to those individuals who can establish 'disability' within the terms of the Social Security Act." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). One is thus under a disability "only if his physical or mental . . . impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

A claimant must meet all five parts of the test set forth in 20 C.F.R. § 404.1520 in order to receive disability benefits from Social Security. The test is as follows:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments, benefits are denied without further analysis.
>
> Step Three: If the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled without further analysis.
>
> Step Four: If the claimant is able to perform his or her previous work, benefits are denied without further analysis.

>Step Five: If the claimant is able to perform other work in the national economy, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 554 n.2 (6th Cir. 1995); *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 687-88 (6th Cir. 1985). "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled." *Preslar*, 14 F.3d at 1110. "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Id.* "Step five requires the [Commissioner] to show that the claimant is able to do other work available in the national economy. . . ." *Id.*

**D.     Administrative Record**

A review of the medical evidence contained in the administrative record and presented to the ALJ indicates that in May of 1987, Plaintiff fractured the head of her fifth metatarsal on her right foot and was unable to work for a period of time. (Tr. at 123.)

In 1999, Dr. Brenda Fortunate, D.O., operated on Plaintiff to accomplish a "re-do L5-S1 posterior fusion" and in May of 2000, removed the electrical bone growth stimulator. (Tr. at 163.)

In March of 2000, Plaintiff underwent a course of physical therapy at Work-Fit, a Division of Healthtrax International. (Tr. at 248.) The therapist noted that Plaintiff was working as an inspector at that time but that Plaintiff stated "there is no real comfortable position for her to be in at work." (*Id.*) Plaintiff complained of "radiating pain down the left leg," "sharp shooting pain, intermittent," and that "her pain is currently at an 8 and at an 8 when it is at it's [sic] worse [sic]." The therapist indicated that Plaintiff had been "through therapy several times" and "due to her restrictions she is able to complete her job daily." (*Id.*)

In October of 2000, Dr. Edmund Messina, M.D., indicated that Plaintiff could "return to work as of 10/4/00, without restriction...[as] a trial return to work..." (Tr. at 265.)

In April of 2001, Plaintiff consulted with Dr. Fortunate because she had fallen on the ice and had recurrent lower back pain and pain in her buttocks down the left leg and occasionally past the knee. (Tr. at 165.) It was recommended that Plaintiff pursue a course of physical therapy at the Genesys Back Care Center. (*Id.*)

In August of 2001, Plaintiff was examined by Dr. Linda Selwa, M.D., because of her complaints of becoming faint and feeling dizzy for "a few seconds." (Tr. at 169.) Dr. Selwa was unable to "know what exactly is causing these episodes" and ordered an "MRA to evaluate blood flow to her brain." (*Id.*) Dr. Selwa noted that Plaintiff was "alert and oriented times three, [and was] a well-developed, well-nourished female in no apparent distress." (Tr. at 168.)

In November of 2001, Plaintiff was referred to Dr. Richard W. Smith, D.O., of Flint Gastroenterology Associates, P.C., due to her complaints of chronic diarrhea. (Tr. at 341.) Dr. Smith opined that the cause of the diarrhea was "irritable bowel" and Dr. Smith advised Plaintiff to "watch out for as far as her adhesions are concerned and bowel obstruction [which Dr. Smith was] more concerned [about] in her case if she starts having problems with constipation than the diarrhea." (Tr. at 342.)

In December of 2001, after Plaintiff suffered a slip and fall, Dr. Fortunate referred Plaintiff to Dr. Todd A. Sandrock, D.O., who diagnosed an "acute closed nondisplaced left fifth metatarsal fracture." (Tr. at 340.) Dr. Sandrock placed Plaintiff in a "removable short leg walking cast" and recommended that Plaintiff "ice, rest and elevate the injured extremity." (*Id.*) Plaintiff was given a follow-up examination by Dr. Sandrock's physician's assistant ("P.A.") in January of 2002 at

7

which time he noted the metatarsal fracture was healing and Plaintiff's progress post-fracture was satisfactory. (Tr. at 348.)

In January of 2002, Plaintiff was examined at the request of the Disability Determination Service by Dr. Samiullah Sayyid, M.D.. Plaintiff described "chronic backache and had surgery times 2 at Genesys Regional Medical Center [and]...chronic diarrhea going on for the last year." (Tr. at 343.) Dr. Sayyid's conclusion was that "[t]his 44-year-old female patient has worked hard in Delphi for 23 years on the assembly line until February of 2001. She is dependent on her husband's support." (Tr. at 345.) Dr. Sayyid's specific notations reveal that Plaintiff's heart, lungs, abdomen (including bowel sounds, liver and spleen), neurological system, sensory function, coordination, joints, extremities (other than the temporary cast on her left foot to mid-leg), dexterity, and ambulation were all normal. (Tr. at 344-45.)

Between May and September of 2003, Plaintiff saw Dr. Renee Krusniak, D.O., regarding edema of her hands. (Tr. 388-92.) Dr. Krusniak suspected some form of arthritis was causing the swelling and noted that Plaintiff had an upcoming appointment with a rheumatologist. (Tr. at 388.)

In August of 2003, Dr. Fortunate referred Plaintiff to Dr. Jolanta Sabotka, M.D., regarding "joint pain." (Tr. at 363.) Dr. Sabotka noted that Plaintiff's "presentation is compatible with inflammatory joint disease, probably rheumatoid arthritis, seronegative." (Tr. at 364.) This diagnosis was confirmed and Dr. Sobotka prescribed Prednisone and Azulfidine but due to Plaintiff's headache complaints, Azulfidine was discontinued and Plaintiff was placed on Methotrexate in its place. (Tr. at 366.) X-ray images taken around this same time indicated "no evidence of acute cardiopulmonary disease." (Tr. at 365, 477.) Dr. Sobotka followed up with Plaintiff in September of 2003, and gave Plaintiff a "steroid burst." (Tr. at 443.)

8

In September of 2003, Dr. Fortunate referred Plaintiff to Dr. Charles R. Davies, M.D., because of complaints of migraine headaches. (Tr. at 376.) Plaintiff's prescriptions for Imitrex, Compazine, BuSpar, and Depakote were refilled and Dr. Davies recommended that her gynecologist and rheumatologist be consulted as to whether her other medications could be changed to medications that do not exacerbate headaches. (Tr. at 377.)

In addition, during this same time period, Dr. Fortunate referred Plaintiff to a Dr. Wilbur J. Boike, M.D., because of Plaintiff's complaints of "ongoing low back and leg pain." (Tr. at 442.) Dr. Boike's examination "reveal[ed] normal strength in both lower extremities, both proximally and distally" therefore, Dr. Boike did "not have any specific recommendations regarding [Plaintiff's] leg pain." (*Id.*)

In October of 2003, Miriam D. Pellerino, M.D., interpreted x-rays of Plaintiff's spine noting that the "thoracic vertebrae appear of normal height and alignment [and that the] disc spaces are well maintained [and] [t]he pedicles are intact." (Tr. at 476.)

In November of 2003, Dr. Fortunate referred Plaintiff to Dr. Dindi D. Reddy, M.D., to conduct an MRI of Plaintiff's right knee. (Tr. at 379.) Dr. Reddy found:

> serpiginous signal abnormality in the posterior inferior articular surface of lateral femoral condyle...[and the] fatty marrow is seen in the center of this signal abnormality. Articular cartilage is normal.
>
> Both menisci, cruciate and collateral ligaments are normal. Exterior Mechanism of knee is intact. Soft tissues surrounding the knee are normal....[which] most likely represents old avascular necrosis, other possibility is undisplaced fracture, clinical correlation is advised.

(Tr. at 379.)

In December of 2003, Dr. Fortunate referred Plaintiff to Dr. Frederick C. Schreiber, D.O. due to Plaintiff's complaint of right knee pain. (Tr. at 427.) Dr. Schreiber noted that Plaintiff

9

"really does not have significant synovial thickening of the right knee [and that ] [s]he has no effusion of her knee." (Tr. at 428.) He also stated that her "patellofemoral joint is stable, but that she is diffusely apprehensive to palpitation about her knee." (*Id.*) X-rays of Plaintiff's knee were "negative." (*Id.*) In addition, an MRI of Plaintiff's knee did "not reveal hypertrophic synovitis" and showed "no effusion." The MRI did show a "signal alteration within the lateral femoral condyle consistent with probable avascular necrosis or a bone infarct in the past" but [i]t d[id] not appear to be acute inflamed." (*Id.*) As a result, Dr. Schreiber concluded that "[w]ith no evidence of articular disruption and no effusion of the knee [he] would recommend conservative measures," such as "resting the knee." (Tr. at 429.)

In December of 2003, Dr. Fortunate referred Plaintiff to Dr. Christopher Ash, D.O., for "a complaint of a fullness and pain and tenderness along her costal margin underneath her left breast." (Tr. at 433.) Dr. Ash opined that Plaintiff "has a pretty significant case of costochondritis, and she has already taken a fair amount of medicine for her arthritis at this time [so he] fe[lt] there [wa]s really nothing surgical to remove at this point, and [he] recommend[ed] that she follow up with her rheumatologist." (*Id.*)

Plaintiff also saw Dr. Sobotka before her scheduled appointment in December of 2003, because she was complaining of left hip pain. (Tr. at 434.) Dr. Sobotka noted that Plaintiff had "full range of motion of the hip" but that "it is irritable in all places" because Plaintiff indicated she had "tenderness." (*Id.*) Dr. Sobotka ordered an x-ray of Plaintiff's hip and it showed that the "osseous structures of the left hip are intact without gross evidence of fracture or dislocation" and that the "articular surfaces are unremarkable." (Tr. at 474.) Accordingly, the conclusion from the x-ray was a "negative left hip." (*Id.*)

10

In March of 2004, Dr. Sobotka "explained to [Plaintiff] that [she] is not certain what is going on with [Plaintiff], at present [Plaintiff's] tests are conflicting, therefore, [Dr. Sobotka] recommended that we obtain the blood work...give her a Depo-Medrol IM today which [Plaintiff] requested...see her next week [and] [i]f she continues having nonconclusive tests [Dr. Sobotka] will set [Plaintiff] up for evaluation at U of M who may recommend a different treatment." (Tr. at 481.)

### E.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since February 16, 2001. (Tr. at 28.) At step two, the ALJ found that Plaintiff's combination of impairments[3] were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (*Id.*) At step four, the ALJ found that Plaintiff could perform her previous work as a general office clerk and inspector (sedentary to light exertion) because that work "did not require the performance of work-related activities precluded by her residual functional capacity." (*Id.*) [4] Therefore, the ALJ found Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.* at 29.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

---

[3] Specifically, degenerative disc disease of the lumbar spine status post fusion at L5-S1 (1998), refusion (5/99) and removal of bone growth stimulator (5/00), chronic diarrhea of unknown etiology, migraine headaches, seronegative rheumatoid arthritis (diagnosed since July 2003), status post hysterectomy (1987), and status post fracture of left fifth metatarsal (12/01) with complete healing.

[4] The ALJ did not address her ability to conduct other past relevant work as a spot welder (medium exertion) or as an automobile assembler (light exertion). (*Id.*)

11

The ALJ determined that Plaintiff possessed the residual functional capacity to return to her previous work as an inspector or general officer clerk both of which require a limited range of sedentary to light exertion. (Tr. at 28.)

> Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a) (1991). Social Security Ruling (SSR) 83-10 clarifies this definition and provides that:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.
>
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether or not substantial evidence supports the ALJ's decision.

12

**2.     Substantial Evidence**

Plaintiff argues that substantial evidence fails to support the findings of the Commissioner. In this circuit, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Mullen,* 800 F.2d at 545.  In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

The ALJ concluded that Plaintiff had the ability to return to her prior work.  This finding ended the ALJ's disability inquiry because Plaintiff could not make out a prima facie showing of disability as she could return to her previous work.  Step Four "necessarily entails a comparison of the physical demands of the claimant's past relevant work with [her] present mental and physical capacity." *Veal v. Bowen*, 833 F.2d 693, 697 (6th Cir. 1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  The Commissioner's regulations state:

> If you can do your previous work (your usual work or other applicable past work), we will determine that you are not disabled.  However, if your residual functional capacity is not enough to enable you to do any of your previous work, we must still decide if you can do any other work. . . .

20 C.F.R. § 404.1561.

In *Studaway v. Sec'y of Health & Human Servs.*, 815 F.2d 1074 (6th Cir. 1987), the Sixth Circuit clarified the standard of proof necessary for a showing that a social security benefits claimant is unable to return to his or her former work:

> Rather, the Act requires that he show that his impairments are so severe that he is "unable to do his previous work. . . ."  42 U.S.C. § 423(d)(2)(A).  He must prove "an inability to return to his former <u>type</u> of work and not just to his former job." *Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir. 1986) (emphasis in original). *See also Gray v. Heckler*, 760 F.2d 369, 273 (1st Cir. 1985); *De Loatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983); *Jock*, 651 F.2d at 135.

*Studaway*, 815 F.2d at 1076. The Court in *Studaway* affirmed the denial of benefits concluding that "[b]ecause the relevant inquiry is whether *Studaway* could return to his past type of work rather than his past job, we are compelled to affirm." (*Id*.)

In determining the level of exertion required by prior work, the ALJ may normally look to the job descriptions contained in the <u>Dictionary of Occupational Titles</u>. *De Loatche v. Heckler*, 715 F.2d 148 (4th Cir. 1983). However, the job categories of the Dictionary may be overcome by evidence demonstrating that the particular duties of plaintiff's prior work were not those envisioned by the framers of the Dictionary. *Carter v. Sec'y of Health & Human Servs.*, 834 F.2d 97 (6th Cir. 1987).

On this record, I suggest that substantial evidence supports the ALJ's conclusion that Plaintiff retains the residual functional capacity to return to her previous work as an inspector or general office clerk which are considered sedentary to light work. After Plaintiff's fall in December of 2001, Dr. Sandrock's physician's assistant ("P.A.") noted that the metatarsal fracture was healing and Plaintiff's progress one month post-fracture was satisfactory. (Tr. at 348.) Dr. Sayyid's examination around that same time, i.e., January 2002, noted that Plaintiff's heart, lungs, abdomen neurological system, sensory function, coordination, joints, extremities (other than the temporary cast on her left foot to mid-leg), dexterity, and ambulation were all normal. (Tr. at 344-45.) X-ray images taken around August 2003 indicated "no evidence of acute cardiopulmonary disease." (Tr. at 365, 477.) Dr. Boike's examination "reveal[ed] normal strength in both lower extremities, both proximally and distally[.]" (Tr. at 442.) In October of 2003, Dr. Pellerino, reported that x-rays of Plaintiff's spine showed normal spacing of the vertebrae. (Tr. at 476.) The next month, Dr. Reddy reported that an MRI of Plaintiff's right knee showed that articular

cartilage, menisci and ligaments and soft tissues surrounding the knees were all normal. (Tr. at 379.) Dr. Schreiber noted in December 2003that Plaintiff "really does not have significant synovial thickening of the right knee [and that] [s]he has no effusion of her knee." (Tr. at 428.) He also stated that her "patellofemoral joint is stable[.]" (*Id.*) X-rays of Plaintiff's knee were "negative." (*Id.*) That same month, Dr. Sobotka noted that although Plaintiff's hips appeared irritable, they had "full range of motion..." (Tr. at 434.) X-rays of Plaintiff's hip showed that "osseous structures of the left hip are intact without gross evidence of fracture or dislocation" and that the "articular surfaces are unremarkable." (Tr. at 474.)

The ALJ also noted that Plaintiff's daily activities include caring "for her personal needs, attends church services regularly, drives twice a week, and frequently visits with her parents and grandmother" in addition to flying to Florida in September of 2003. (Tr. at 27 (ALJ), 89-92 (Plaintiff).) Plaintiff fixes all three meals each day for her family and stated that there has been no change in her ability to care for her personal needs since the onset of her illness. (Tr. at 89.) Plaintiff reported that she folds clothes and dusts and also does some vacuuming around the house, spending one to two hours each day on these activities. (Tr. at 90.) Plaintiff also does the grocery shopping for her family and is able to drive herself to do so. (*Id.*) Taken as a whole, I suggest that Plaintiff's daily activities further show that substantial evidence exists to support the ALJ's conclusions.

The ALJ failed to find Plaintiff's complaints of disabling pain fully credible. Social Security regulations prescribe a two-step process for evaluating subjective complaints of pain. The plaintiff must establish an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain rising from the condition, or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise

15

to the alleged pain. 20 C.F.R. § 404.1529(b) (1995); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 20 C.F.R. § 404.1529(c) (1995); *Jones*, 945 F.2d at 1369-70. In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id.*

In the present case, I suggest that the Plaintiff does not have any one objectively determined medical condition that is of such severity that it could reasonably be expected to give rise to the alleged debilitating pain. 20 C.F.R. § 404.1529(b)(1995); *Jones, supra*. Therefore, Plaintiff must show objective medical evidence to confirm the severity of the alleged pain arising from the impairments.[5] An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses, such as the Plaintiff. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility."); *Krupa v. Comm'r of Soc. Sec.*,

---

[5]Plaintiff argues that she is not required to present "objective evidence of the pain itself," citing *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 852 (6th Cir. 1986). (Pl. MSJ, Dkt. 9 at 7.) However, *Jones, supra*, was decided after *Duncan* and cites *Duncan* in clarifying the standard applicable in evaluating subjective complaints of pain in this Circuit. Therefore, *Jones, supra,* controls.

16

No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999). Under this standard, I suggest that there is insufficient basis on this record to overturn the ALJ's credibility determination[6].

The ALJ's findings also follow the opinions of the vocational expert, Judith Fendora, which came in response to proper hypothetical questions that were appropriately consistent with the objective medical findings contained in the medical records available to the ALJ, and in particular, the previously described findings and assessments of Drs. Fortunate and Sobotka, as well as the physicians to whom Plaintiff was referred. (Tr. at 507-11.); *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 481 (6th Cir. 1988); *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

After review of the record, I conclude that the decision of ALJ Douglas N. Jones, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decision makers may go either way without interference from the courts," *Mullen*, 800 F.2d at 545, as the decision is supported by substantial evidence.

---

[6] I further posit that the medical evidence supports the ALJ's conclusion that Plaintiff's allegations of pain were undermined by the lack of more aggressive treatment (Tr. at 27) because the evidence reveals a history of subjective complaints of pain for which no additional, let alone aggressive, treatment was offered. For example, Dr. Selwa offered no treatment for Plaintiff because she was unable to "know exactly what is causing these [faint an d dizzy] episodes" (Tr. at 169, Dr. Davies was unable to find a cause or recommend any treatment for Plaintiff's continued alleged severe migraines (Tr. at 377), Dr. Boike was unable to recommend any treatment for Plaintiff's alleged leg pain because Plaintiff's extremities appeared normal (Tr. at 442), Dr. Pellerino concluded Plaintiff's spine, other than the fused disc, was normal (Tr. at 476), Dr. Reddy did not suggest any treatment for Plaintiff because he was unable to find a cause for Plaintiff's knee pain because the cartilage, ligaments, and soft tissues were all intact (Tr. at 379), Dr. Schreiber also refrained from prescribing any treatment because he was also unable to find a cause for Plaintiff's alleged knee pain because he found no synovitis, disruption, or effusion of the knee and the x-ray was negative (Tr. at 428), Dr. Sobotka did not recommend any treatment because she was unable to find a cause for Plaintiff's alleged hip pain because the x-ray of the hip was negative and Plaintiff had a full range of motion in her hip (Tr. at 434), and Dr. Sabotka indicated that, in general, she was "not certain what is going on with [Plaintiff because the] tests are conflicting." (Tr. at 481.)

**III.    REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n. of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                                      s/ *Charles E. Binder*
                                                     CHARLES E. BINDER
Dated: January 10, 2007                United States Magistrate Judge


**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date, and electronically served on Janet L. Parker and Mikel E. Lupisella, and served on District Judge Thomas L. Ludington in the traditional manner.

Date:  January 10, 2007        By     s/Patricia T. Morris
                                                 Law Clerk to Magistrate Judge Binder